11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Larry Joe Jordan 

Appellant

Vs.                   No.  11-03-00222-CR -- Appeal from Jones County

State
of Texas

Appellee

 

A jury convicted appellant, Larry Joe Jordan, of
first degree murder and assessed his punishment at confinement for life in the
Institutional Division of the Texas Department of Criminal Justice.  The jury also imposed a fine of $5,000.  Appellant brings six issues on appeal
attacking his conviction.  Most of his
issues concern two written statements wherein appellant confessed to committing
the alleged crime.  We affirm.

The indictment charged appellant with
intentionally or knowingly causing the death of 
Lenore Ann Ewing by blunt impact to the head and by stabbing with a
knife.  The victim=s
11-year- old daughter testified that she last saw her mother on the morning of
February 26, 2001.  The victim told her
daughter that morning that she would be having lunch with someone named ALarry.@  A calendar which the victim maintained also
reflected her intention of having lunch on that day with someone named ALarry.@

Detectives of the Abilene Police Department
initiated a missing person investigation on February 26, 2001, when the victim
did not return to her home.  On March 2,
2001, a passerby discovered the victim=s
body near Lake Fort Phantom.  An autopsy
of the body revealed two blunt impact injuries to the victim=s head and eight stab wounds to the
victim=s
back.  The blunt force trauma injuries
resulted in fractures of the victim=s
forehead and skull.  The stab wounds
varied in depth between two and ten inches. 
The victim=s heart,
stomach, and one of her lungs were pierced as a result of the stabbing.  The pathologist who performed the autopsy
determined that both the stab wounds and the blunt force trauma to the head
caused the victim=s death.








The police identified three possible suspects at
the outset of their investigation of the murder.  The three suspects were Don Hopper, Steve
Johnson, and an unknown person with whom the victim had recently been
corresponding over the internet.  Hopper
and the victim had recently broken up from a relationship prior to her
murder.  The victim continued to live in
Hopper=s
residence after the break up.  Hopper and
the victim had a fight on the night before she disappeared about her continuing
to reside in his residence.  Hopper also
accused the victim of stealing money from his auto service business.  Detective John Reid testified that the
Abilene Police Department conducted an intensive investigation of Hopper and
that no evidence linking him to the murder was discovered.  Detective Reid noted that Hopper had alibi
witnesses that were able to vouch for his activities on February 26, 2001. 

Steve Johnson was an employee and close friend of
Hopper.  Johnson made some statements
during the investigation of the murder which indicated that he might have been
involved in the murder.  However, the
police did not find any evidence linking Johnson to the murder other than his
statements.  

The third suspect which the police initially
investigated identified himself as ALawrence
Price@ in his
internet correspondence with the victim.[1]  The victim and AInternet
Larry@ had apparently
met for a face-to-face meeting on at least one occasion.  Also, the name ALarry@ appeared on the victim=s calendar 9 times.  The police were not able to either locate or
identify Internet Larry.  In the e-mails
that he sent to the victim, Internet Larry claimed to be an engineer working in
San Angelo.  The police determined that
Internet Larry used an Aanonymous@ e-mail address when he corresponded
with the victim.  The police were also
able to determine that Internet Larry used a computer at the San Angelo Public
Library for communicating with the victim. 
Detective Reid testified that the police were sure that  appellant was not the person posing as
Internet Larry because of appellant=s
limited language skills.  








Appellant became a suspect in the case in July 2002.  Appellant=s
wife, Cynthia Ann Biddy, informed law enforcement officers that appellant had
made some statements to her indicating his involvement in the victim=s murder.  Biddy testified that appellant made the
following comment during a physical altercation between the two of them: ABitch, I=m
going to screw you like the girl at the lake.@  Detective Reid spoke with appellant on July
12, 2002, at the Jones County Jail. 
Detective Reid obtained the following written statement from appellant
during the early afternoon hours of July 12, 2002:

I met [the victim] at the hideaway club and she
came to my real mothers house in Putnam. 
We slept together one time there at Putnam.  

 

One night [the victim] called me she was real
scared, her husband was breaking things. 
I could hear him being loud and things breaking.  The next morning [the victim] called and
wanted to meet me at the restaurant on [Interstate 20].  I met her and she got into my truck.  We talked and then drove to the lake.  We parked and got out.  We sat on the tailgate and talked.  I told her that I couldn=t see her anymore.  She got mad and hit me with a baseball
bat.  She hit me on the shoulder and kept
hitting me.  She knocked me down and got
on top of me.  I couldn=t do anything, I was scared.  I grabbed a rock with both hands and hit her
on the head twice.  She fell off of me
and I got up.  I blacked out, and I
remember being on my knees beside her praying to God.  I got up and went to my step parents house in
my truck.

 

Appellant provided the police with a second
statement several hours later on July 12, 2002. 
Appellant stated as follows in the second statement:  

When I talked with the detectives earlier, I left
some things out.  I asked Clay Coffey to
call them so I could talk with them some more. 
When we went to the lake we turned off FM600 at a place where a concrete
ramp goes up a dam.  I also stabbed her
about 10 times in her back with a knife I had in the back of my pickup.  I did this to get her off of me.  I tried to help her after it was over, but
she was already dead.  I covered her up
and left.  

 

I=m
sorry this happened I was scared.  I
would have called for help but I was scared. 


 

Appellant asserts in his first issue that the trial
court erred in denying his motion to suppress both of his written
statements.  He contends that his
statements were not voluntarily given as a result of his diminished mental
capacity.  Dr. James Crowley, M.D., a
psychiatrist who evaluated appellant, assessed appellant=s
intellectual status as ABorderline
Intellectual Functioning@
which he defined as falling between low normal intelligence and mild mental
retardation.  Dr. Crowley estimated
appellant=s IQ to
be in the range of 65 to 75.








In reviewing a trial court=s
ruling on a motion to suppress, appellate courts must give great deference to
the trial court=s
findings of historical facts as long as the record supports the findings. Guzman
v. State, 955 S.W.2d 85, 87 (Tex.Cr.App.1997).  Because the trial court is the exclusive fact
finder, the appellate court reviews evidence adduced at the suppression hearing
in the light most favorable to the trial court=s
ruling. Carmouche v. State, 10 S.W.3d
323, 327 (Tex.Cr.App.2000). We also give deference to the trial court=s rulings on mixed questions of law and
fact when those rulings turn on an evaluation of credibility and demeanor. Guzman
v. State, supra. Where such rulings do not turn on an evaluation of
credibility and demeanor, we review the trial court=s
actions de novo. Guzman v. State, supra; Davila v. State, 4 S.W.3d 844 (Tex.App. - Eastland 1999, no pet=n).            The trial court conducted a pretrial
hearing on appellant=s
motion to suppress the written statements. 
With regard to the first statement, Detective Reid testified at the
hearing that he read each of the AMiranda@[2]
warnings to appellant and that appellant understood them prior to his statement
being taken.  The statement indicates
that Detective Reid gave these warnings to appellant at 11:30 a.m. on July 12,
2002.[3]  Appellant signed the completed statement at
2:00 p.m. on July 12, 2002.

After Detective Reid took the first statement, he
received a call from Clay Coffey, a deputy with the Jones County Sheriff=s Department, advising  him that appellant wanted to speak with him
again.  Appellant=s
second statement indicates that Detective Reid gave appellant another set of
warnings at 11:22 p.m. on July 12, 2002. 
Appellant signed the second statement at 12:18 a.m. on July 13, 2002.








Appellant informed Detective Reid that he could
not read or write.  Detective Reid
testified that he gave extra attention to making sure appellant understood the
warnings listed on the statements as a result of appellant=s reading limitations.  Detective Reid transcribed both of appellant=s statements and Deputy Coffey read the
statements back to appellant prior to him 
signing them.  Detective Reid
denied the use of any promises, threats, or coercion with respect to the taking
of either of the statements.  

Detective James David Atkins of the Abilene Police
Department was also present when both of the statements were obtained from
appellant.  Detective Atkins testified
that appellant told the officers that he understood the warnings which were
read to him.  Detective Atkins also
testified that appellant took a longer time to sign his signature on the
statements than the average person. 
Detective Atkins testified that appellant exhibited a full range of
emotions when the statements were obtained ranging from calm to angry and
crying.  Deputy Coffey testified that he
went over the warnings listed in the statements when he read the statements
back to appellant each time and that appellant understood the warnings.  With respect to the second statement, Deputy
Coffey testified that appellant informed him that he wanted to speak again with
Detective Reid and Detective Atkins because Ahe
knew there was a knife involved.@  

Prior to the receipt of evidence at trial, the
trial court denied appellant=s
motion to suppress the two written statements. 
In determining whether a trial court=s
decision on a motion to suppress is supported by the record, we generally only
consider evidence adduced at the suppression hearing because the court=s ruling was based on it rather than
evidence presented later at trial.  Rachal v. State, 917 S.W.2d 799, 809 (Tex.Cr.App.) cert. den=d,
519 U.S. 1043 (1996); Hardesty v. State, 667 S.W.2d 130, 133
(Tex.Cr.App.1984).  This general rule is
inapplicable, however, when the suppression issue is raised during the trial on
the merits.  Rachal
v. State, supra at 809; Hardesty v. State, supra at
133.  In this instance, the attorneys
elicited a great deal of testimony at trial about the circumstances surrounding
the taking of the two statements. 
Accordingly, we also review the evidence offered at trial in our
consideration of the trial court=s
denial of the motion to suppress.








In addition to the matters to which he testified
at the suppression hearing, Detective Reid testified that the task of taking
the two statements from appellant was very difficult.  He attributed this difficulty to appellant
being emotional and going off on tangents during the questioning.  Detec-tive Reid
confronted appellant during the interview process when appellant made
statements that did not appear to be true in an effort to redirect his
focus.  Detective Reid raised his voice
at times during the interview process and slapped the table on one
occasion.  With respect to the warnings
given to appellant, Detective Reid recalled that he explained the word Acoercion@
to appellant because he did not know what it meant.

Article 38.21 of the Code of Criminal Procedure
provides that a statement of an accused may be used in evidence against him if
it appears that it was freely and voluntarily made without compulsion or
persuasion. TEX. CODE CRIM. PRO. ANN. art. 38.21 (Vernon 1979); Penry v. State, 903 S.W.2d 715, 744 (Tex.Cr.App.), cert. den=d,
516 U.S. 977 (1995). The determination of whether a confession is voluntary is
based on an examination of the totality of circumstances surrounding its
acquisition.  Penry
v. State, supra  at 744.  While not alone determinative, mental
impairment is a factor in ascertaining the voluntariness
of a confession. Penry v. State, supra
at 744; Bizzarri v. State, 492 S.W.2d
944, 946 (Tex.Cr.App.1973).  In essence,
the question is whether the accused=s
mental impairment is so severe that he was incapable of understanding the
meaning and effect of his statement.  See
Casias v. State, 452 S.W.2d 483, 488
(Tex.Cr.App.1970).

The determination of whether appellant voluntarily
gave the two written statements is a mixed question of law and fact.  Since this question involves the credibility
and demeanor of the witnesses, we review the record applying an abuse of
discretion standard of review.  Guzman
v. State, supra at 89.  The
officers that obtained the statements from appellant testified that appellant
understood the warnings which were given to him and that he was not forced or
intimidated into giving the statements. 
While Dr. Crowley testified that appellant had a lower than average
level of intelligence, he did not testify that appellant was incapable of
understanding the warnings or making a statement of his own accord.  The record supports the trial court=s determination that appellant=s statements were voluntarily
given.  Appellant=s
first issue is overruled.








Appellant=s
fifth and sixth issues also concern the voluntariness
of his written statements.  The court=s charge instructed the jury to
disregard appellant=s
statements if it did not find beyond a reasonable doubt that appellant made the
statements voluntarily.  See TEX.
CODE CRIM. PRO. ANN. art. 38.22, '
6 (Vernon 1979).  In his fifth issue,
appellant challenges the legal sufficiency of the evidence supporting the jury=s Aimplicit
finding@ that
appellant voluntarily made the statements.[4]  Appellant challenges the factual sufficiency
of the evidence supporting this finding in his sixth issue.

The Texas Court of Criminal Appeals recently
addressed the availability of a challenge to the factual sufficiency of the
evidence supporting evidentiary findings in Hanks v. State, 137 S.W.3d
668 (Tex.Cr.App.2004).  Pursuant to TEX.
CODE CRIM. PRO. ANN. art. 38.23(a) (Vernon Pamph
Supp. 2004-2005), the jury charge in Hanks instructed the jury to
disregard any evidence which it determined to have been obtained in violation
of law.  Hanks v. State, supra at
669.[5]  The court recognized in its analysis that a
conflict existed in the courts of appeals as to whether a sufficiency-
of-the-evidence challenge can be raised with respect to an Aadmissibility of evidence@ issue. 
Hanks v. State, supra at 671; see Caddell
v. State, 123 S.W.3d 722 (Tex.App. - Houston
[14th Dist.] 2003, pet=n
ref=d); Davy v. State, 67 S.W.3d 382
(Tex.App. - Waco 2001, no pet=n).  The court ultimately held that a factual
sufficiency challenge to an Aadmissibility
of evidence@ issue is
not permitted.  Hanks v. State, supra
at 672.  The court determined in reaching
its holding that a factual sufficiency review is only appropriate to challenge
the sufficiency of the State=s
proof of the elements of the offense.

An issue under Article 38.22, section 6 is also an
Aadmissibility of evidence@ issue because it also only affects the
jury=s
determination of the evidence it will consider in determining the accused=s guilt.  As such, the holding of the Court of Criminal
Appeals in Hanks precludes appel-lant=s attempt to challenge the factual
sufficiency of the evidence relating to the jury=s
determination of the voluntariness question.  Hanks v. State, supra at 672.  Appellant=s
sixth issue is overruled.








The court in Caddell
held that both legal and factual sufficiency complaints are only appropriate
for challenging the evidence relating to the elements of the offense and that
they are inappropriate for attacking Aadmissibility
of evidence@
issues.  Caddell
v. State, supra at 726.  The Court of
Criminal Appeals cited this statement in Caddell
with approval in Hanks.  Hanks
v. State, supra at 671.  We agree
with the reasoning in Caddell that neither a
legal nor factual sufficiency challenge is permitted with respect to an issue
which addresses the admissibility of evidence. 
Appellant=s fifth
issue challenging the legal sufficiency of the evidence supporting the jury=s determination of the voluntariness issue is overruled.  

In his third and fourth issues, appellant contends
that he was not properly warned prior to giving his statements.  He bases this contention on the trial
testimony of Marlon Smith, Jones County Justice of the Peace.  Both of the written statements indicated that
Judge Smith gave the following warnings to appellant:

On
[July] 12, 2002, at 10:20 o=clock
a.m., I was taken before Marlin Smith, a magis-trate
of Jones County, Abilene, Texas.  At that
time, such magistrate informed me of the accusation against me together with
all affidavits filed with such accusation; of my right to retain counsel, of my
right to remain silent, of my right to have an attorney present during any
interview with peace officers or attorneys representing the state, of my right
to terminate the interview anytime, of my right to request the appointment of counsel
if I am unable to afford counsel, and of my right to have an examining
trial.  He also informed me that I am not
required to make any statement, and any statement made by me may be used
against me.  He also allowed me
reasonable time and opportunity to consult counsel.

 

See TEX. CODE CRIM. PRO. ANN. art. 15.17(a) (Vernon Supp.
2004-2005).  Judge Smith testified that
he went over the magistrate=s
warning with appellant in a thorough fashion and that appellant appeared to
understand his rights.  Judge Smith=s brief testimony concluded with the
following series of questions asked by defense counsel:

Q:  Did you
explain to him he had the right to have an attorney present during any
questioning?

 

A:  I did,
sir.

 

Q:  And you
explained to him he had the right to terminate any police interviews at any
time?

 

A:  I did,
sir.

 

Q:  Did you
tell him that any statements that he made could be used for or against him?

 

A:  Yes,
sir.

 

Q:  Did you
explain to him that he had the right to have an examining trial?

A:  Yes,
sir.








 

Q:  Did you explain to him
that he had the right not to make any statements?

 

A: Yes, sir.

 

Q:  And you believe he
understood those rights?

 

A:  I do, sir.

 

Q:  Judge Smith, what you=re telling us today is what you
recollect as occurring on July 12, 2002?

 

A:  Yes, sir.

 

(Emphasis added)

A warning to a suspect before interrogation that a
statement could be used Afor
or against@ him or
her is an impropriety that can require that the statement be held
inadmissible.  Creager
v. State, 952 S.W.2d 852, 854 (Tex.Cr.App.1997); see Article
15.17(a) & Article 38.22, section 2(a)(1). 
Appellant  did not request the
trial court to either withdraw or strike the previously admitted statements
from the record based upon Judge Smith=s
above-quoted testimony.  Appellant sought
and obtained an instruction in the court=s
charge which instructed the jury to disregard appellant=s
statements if it determined that appellant was not properly warned prior to
giving his statements.[6]








On appeal, appellant raises the issue concerning
the warning that he received by challenging the legal and factual sufficiency
of the evidence supporting the jury=s
Aimplied finding@
that he was properly warned with respect to his statements.  The issue instructing the jury to disregard
appellant=s
statements if he was not properly warned is another issue which addresses the
admissibility of evidence rather than an element of the offense charged.  For the same reasons we have overruled
appellant=s fifth
and sixth issues, we overrule appellant=s
third and fourth issues challenging the legal and factual sufficiency of the
evidence supporting the jury=s
determination that appellant=s
statements were properly admitted.

In overruling appellant=s
third and fourth issues, we note that, while appellant challenges the warnings
given by Judge Smith, the issue submitted to the jury restricted its inquiry to
the warnings given by Detective Reid. 
The jury=s implied
finding that Detective Reid properly warned appellant would likely withstand a
legal and factual sufficiency challenge based upon the evidence in the
record.  Moreover, the evidence that
appellant was improperly warned is equivocal at best.  The written statements themselves recite that
Judge Smith gave appellant the proper magistrate=s
warnings required by Article 15.17(a). 
Judge Smith=s
testimony that he informed appellant that his statement could be used Afor or against@
him occurred in a brief, affirmative response to a series of questions about
the warnings he gave appellant. 
Furthermore, Detective Reid testified that he subsequently gave correct
warnings to appellant prior to the taking of each statement.

Finally, in his second issue appellant challenges
the factual sufficiency of the evidence supporting his conviction.  He premises his factual sufficiency challenge
on the evidence suggesting the possibility that Hopper and Johnson were
responsible for the victim=s
murder.  In order to determine if the
evidence is factually sufficient, we must review all of the evidence in a
neutral light and determine whether the evidence supporting guilt is so weak
that the verdict is clearly wrong and manifestly unjust or whether the evidence
contrary to the verdict is so strong that the beyond-a-reasonable-doubt burden
of proof could not have been met.  Zuniga v. State,144 S.W.3d 477 (Tex.
Cr.App.2004).  








In addition to appellant=s
confession to committing the victim=s
murder, there were additional  items of
evidence which supported the jury=s
finding of guilt.  As previously noted,
appellant made statements to others about what he had done to Athe girl at the lake.@ 
Appellant=s birth
mother, Gracie Mae Burton, testified that appellant and the victim had spent
the night with her on one occasion. 
Burton also testified that appellant called her on another occasion
telling her that he needed an alibi as to his whereabouts.  Israel Montez, an
acquaintance of appellant, testified that appellant asked him in either late
February or early March 2001 to help him look for a knife that he had lost at Lake
Fort Phantom.  Montez
also testified that appellant appeared to have recently been involved in a
fight or scuffle based upon scratches on his hands and a bite on his chest.

With respect to Hopper, Johnson, and Internet
Larry,  Detective Reid testified that the
police thoroughly investigated their possible connection to the victim=s murder.  While Hopper had a motive and a history of
disagreements with the victim, he had an alibi as to his whereabouts on the
date the murder is believed to have occurred. 
The police were not able to find any evidence linking either Johnson or
Internet Larry to the murder.  Viewed in
a neutral light, the evidence supporting guilt is not so weak as to render the
verdict clearly wrong and manifestly unjust. 
Furthermore, the the evidence contrary to the
verdict is not so strong that the beyond-a-reasonable-doubt burden of proof
could not have been met.  Appellant=s second issue is overruled.

The judgment of the trial court is affirmed.

 

W. G. ARNOT, III

CHIEF JUSTICE

 

January 6, 2005

Do not publish.  See
TEX.R.APP.P. 47.2(b).

Panel
consists of: Arnot, C.J., and

Wright,
J., and McCall, J.











     [1]The
attorneys referred to the third suspect as AInternet
Larry@ at trial.  Given
the fact that appellant=s first name is also ALarry,@ we will also refer to the third suspect as AInternet Larry.@ 





     [2]Miranda
v. Arizona, 384 U.S. 436 (1966).





     [3]The
statement recites that the following warnings were given to appellant:

 

I, Larry Joe Jordan, after being duly warned by [Detective
Reid], the person to whom this statement is made that:  1) I have the right to remain silent and not
make any statement at all, and that any statement I make may be used against me
at my trial; 2) any statement I make may be used as evidence against me in
court; 3) I have the right to have a lawyer present to advise me prior to and
during any questioning; 4) if I am unable to employ a lawyer, I have the right
to have a lawyer appointed to advise me prior to and during any questioning;
and 5) I have the right to terminate the interview at any time.

 

See TEX. CODE
CRIM. PRO. ANN. art. 38.22, ' 2 (Vernon 1979).





     [4]Appellant
asserts that the jury implicitly found that he voluntarily made the statements
based upon its decision to convict him of the alleged offense.





     [5]The
jury=s resolution of an Article 38.23(a) issue is an Aevidentiary@ finding
because it only affects  the jury=s determination of the evidence it will consider in
determining the accused=s guilt.  Hanks
v. State, supra at 671.  The Court of
Criminal Appeals characterized an Article 38.23(a) issue as an Aadmissibility of evidence@
issue.  Hanks v. State, supra at
672.





     [6]The
court=s charge contained the following instruction:

 

You are instructed that under our law a confession of a
Defendant made while he was in jail or in custody of an officer and while under
interrogation shall be admissible in evidence if it appears that the same was
freely and voluntarily made without compulsion or persuasion.  However, before a confession made to officers
may be considered voluntary, it must be shown by legal evidence beyond a
reasonable doubt that prior to making such statement that the accused has been
warned by the person to whom the statement is made, or by a magistrate, that
(1) he has the right to remain silent and not make any statement, (2) that
anything said by the Defendant will be used against him at trial, (3) that the
statement will be used against him in court, (4) that he has the right to
terminate the questioning at any time during the interview or questioning, and
(5) that he is entitled to the services of an attorney, his own, or, if he is
unable to employ one, a court-appointed attorney, to advise him prior to and
during any questioning or interrogation.

 

So, in this case, if you find from the
evidence, or if you have a reasonable doubt thereof, that prior to the time the
Defendant gave the alleged statement or confession to John Reid, if he did give
it, the said John Reid did not warn Defendant in the respects enumerated above,
or as to any one of such requirements, then you will wholly disregard the
alleged confession or statement and not consider it for any purpose nor any
evidence obtained as a result thereof. 
If, however, you find beyond a reasonable doubt that the aforementioned
warning was given the Defendant prior to his having made such statement, if he
did make it, still, before you may consider such statement as evidence in this
case, you must find from the evidence beyond a reasonable doubt that prior to
making such statement, if he did, the Defendant knowingly, intelligently and
voluntarily waived the rights hereinbefore set out in the said warning, and
unless you so find, or if you have a reasonable doubt thereof, you will not
consider the statement or confession for any purpose whatsoever or any evidence
obtained as a result of the statement, if any.